The Secretary of the Department of Corrections. So, Ms. McDermott. Good afternoon. May it please the Court, Linda McDermott on behalf of Paul Brown. The issues before the Court relate to equitable tolling of Mr. Brown's AEDPA deadline. There's two 3850s in this case, and our contention is that if the first one isn't entitled to equitable tolling, then the Court should also consider whether the second one, which relates to a Brady issue that didn't ripen until well into his original post-conviction proceedings, whether or not that one also should be considered for equitable tolling. But to begin with, the claims that have arisen from Mr. Brown's direct appeal, his original 3851 motion in State Circuit Court, and his state habeas petition before the Florida Supreme Court, there was a series of attorneys that represented him pursuant to Florida statute relating to the fact that all capital collateral defendants are entitled to effective assistance of counsel in those proceedings. Originally, he was assigned to a CCR office. They quickly conflicted off the case without doing any work, although they did have a brief communication with Mr. Brown. And then the second attorney was appointed, Mr. DeMoor. And Mr. DeMoor, the extent of his representation was in writing Mr. Brown a letter, and then writing him a second letter, letting him know he was withdrawing from the case. Just so I'm sure that I'm up with you, so his direct appeal became final on May 3rd, 1999, and Mr. DeMoor was not appointed until August 10th, 1999. I'm assuming your position is it should be tolled during that time period? Well, yes, Your Honor. He didn't have a lawyer. He didn't have a lawyer. He was in the state of Texas, the federal government took jurisdiction back of Mr. Brown because he had a federal sentence that he was serving. And so they removed him from the state of Florida and took him back. He then didn't get counsel appointed until August 10th. So from May 3rd to August 10th, there's some odd, I guess there would be 120 days or so we would be asking for tolling. But I think even more importantly, so when the second attorney gets appointed, Mr. Bonacorsi, that's on February 16th of 2000, and 289 days now have elapsed from Mr. Brown's AEDPA clock. And I'm asking for all of those 289 days to find this court to find equitable tolling in terms of the extraordinary circumstance that he was given an attorney. The attorney originally represented that he would be working on the case in his initial letter. And then according to Bonacorsi, who comes in after the fact, says nothing was done. Nothing was done. So if that isn't abandonment, when you represent, I'm your attorney, and then do nothing, I don't know what it could be other than to be characterized as abandonment. So those are the first 289 days. Can I ask, I know you know a lot more about this than I do, and you're talking about this in terms a little bit different than I was thinking about. So can I just ask you about that? Of course. So my understanding was that the claim that was ultimately made by Mr. Bonacorsi with regarding to the identity of Mr. Keenum, Mr. McGuire, whatever his name was, that has to do with statutory tolling, right? Is that? So this is what I was, so, and the standard's different. So, you know, it has to do with, well, there was a Brady violation, and so that was tolled because the information about this witness's identity was not turned over by the state as required. Correct. Okay. So do we have any, do we know either when that information came to be known by the state, number one? And I know Mr. Bonacorsi raised it, but I don't know which one of his petitions he raised it in. Did he raise it in the November 2000 petition, the February 2001, or the April 2001? Because that stuff's not in our record, the best I could tell. Okay. I do know that he did not raise it in his initial 3851 motion, and it was only when he started preparing for the evidentiary hearing that he then noticed that there was this entry on, I'm going to call him Keenum because that's his legal name, on Keenum's DOC website page that showed there was an Ohio detainer under the name Keenum. Bonacorsi knew him as McGuire. So there was a 3850 filed the day before the evidentiary hearing was supposed to begin. Originally, McGuire, Keenum, was only testifying in relation to, I believe, mitigation issues, and that was why Bonacorsi was calling him. But in preparing the writ that you need to do in state court to have someone brought from state custody to the county for testimony, he did notice this entry. So that was April of 2001, right? Correct. Yeah, that's right. So that's when the amended motion gets filed. I believe the evidentiary hearing starts April 27th, which is the day after. And what the state knew and when is not as easy to pin down. There's a letter in January of 2000, I believe it's in, let me look at it, it's in the exhibits that were attached to our supplement to the petition and it's exhibit T, January 26th of 2001. So this is four months before the evidentiary hearing where the state attorney reaches out to Ohio and the Ohio Department of Corrections and asks for information about Keenum and apparently gets information back because that ultimately gets disclosed to Mr. Brown several years later. So we do know that in the state of Florida, you have an obligation to disclose Brady regardless of whether or not you're in post-conviction or trial, but nothing was disclosed until much later from that particular inquiry on the state's part. Now at the evidentiary hearing, Bonacorsi asks, and the state also arranges for Keenum to have an attorney before he testifies to advise him because there may be some issues that are going to subject him to prosecution, that the issues are not revealed. But when Keenum takes the witness stand and is asked to state his name, he takes the Fifth Amendment. Later in his testimony, he answers a question as to whether or not he's used particular aliases and he does agree that he has used a couple of particular aliases, but not Jeffrey Scott Keenum, which technically wouldn't be an alias because it is his name, his birth name. But he denies that Jeffrey Scott Keenum is a name he's used as an alias. So after the evidentiary hearing, Bonacorsi had tried to pursue the issue, saying that there was information out there, clearly there was a criminal history that he was unaware of, and he does raise that to the Florida Supreme Court in that initial appeal from that post-conviction motion. But what happens is then when Bonner comes on the case later, after the first initial 3851 has been affirmed by the Florida Supreme Court, Bonner then makes a motion for discovery and the state resists turning over anything that it's gathered on Keenum. Ultimately, the state circuit court judge grants her motion. The state then takes an interlocutory appeal, which takes months and months in front of the Florida Supreme Court before they deny the appeal. The records are then submitted for in-camera inspection and then ultimately turned over. Now in those records, there's specific information about Keenum's criminal history, and there's information that Bonacorsi did not have in relation to, I think there was some sort of document, legal document, a will or something that showed that in that legal document he was referred to as Keenum. So based on those records, then Bonner files this successive 3851 contending that there was a Brady or a due process violation, a potential Giglio violation, but she's summarily denied because the court and the state take the position that this has already been litigated, even though there was new evidence that had been disclosed. It was not raised as Brady the first time around. It was only raised as newly discovered evidence. In Florida, that means that your burden of your standard of what you're trying to prove and your availability to what you are entitled to is somewhat different. Brady is obviously a more favorable standard to be under that standard than newly discovered evidence. Let me ask you something. When do you think it became Brady? Was that in January of 2001, or do you think it was Brady sometime before that? Well, we don't know. I mean, having not been a prosecutor, I don't know what prosecutors do to prepare witnesses, but what my understanding is is that running an NCIC on your co-defendant slash critical witness probably happened. And if that happened, then they knew that it was Ohio, that he was an escapee from Ohio using a different name, an alias in Florida, when he was arrested and then took the plea deal here in Florida. And there's no evidence in this record about when that might have happened or even if it happened. Right. There's no evidence. I mean, Bonner claimed there were these red flags, and she the records from Ohio is not really clear because we've been denied an evidentiary hearing on the matter. And that's why I think Justice Quince and Perriente of the Florida Supreme Court have said, even if there's no... I mean, the time to produce evidence or to find out what the evidence is, is the evidentiary hearing. And so if they have a good faith basis, they should have an opportunity to find out when did the state know about these circumstances and was it at trial? Because if so, then that changes things in terms of cross-examination and Keenum's credibility, which is just as Quince points out, is really critical to the case against Mr. Brown. Can I ask you about the statutory tolling issue with regards to subsection D1B? Yes. That one is based on the Brady claim and nothing else and survives only for that claim. Is that accurate? Right. I mean, in Zach, this court said that it doesn't revive the life of all of the claims if one claim is timely. So... Right. That's an alternative argument you've made, but it only applies given our precedent to that one claim. Yes. That claim would be revived if the court found that it ripened at a point and then was told because it is clear that more than a year passed between the various timeframes of litigating that issue in the state court. Right. So assuming that you are right about everything and this only applies to that claim, not to your other general arguments. If you are right about that, the clock started ticking on that claim in July of 2010 when the Florida Supreme Court denied rehearing on the second 3.850. Is that right? Well, I think to be fair, the clock starts ticking when the evidence was disclosed. No, no. The clock starts. I'm assuming that you get statutory tolling all the way through. So your claim becomes available when the discovery is given to you. And then Mr. Brown files the second 3.850 and you go all the way through those proceedings. But then the Florida Supreme Court ultimately denies relief by denying rehearing in July of 2010. Is that right? That's correct. Okay. So at that point, that one year period, even if there's been statutory tolling all the way through, that period then begins to run. Yes. Okay. What do you do about all the time that passes? And granted, there isn't much extra time, but there is six months between July of 2010 and February of 2012 when the Habeas Petition gets filed. That's true. And in that time period, a lawyer named Chris Anderson represented Mr. Brown. His representation started in the Florida Supreme Court when Ms. Bonner had to withdraw due to health reasons. Now, if you look at Mr. Anderson's communications with Mr. Brown, he, Mr. Brown specifically asks, why does Justice Quint say this case is ripe for warrant? And the easy answer to that is because you've exhausted all of your appeals. So now you've become warrant eligible. It's a very simple answer in the state of Florida. But Chris Anderson doesn't answer the question. Instead, what he says is, well, it's just moving along in the process. You're getting close to being done. So he doesn't tell Mr. Brown the truth about the tolling. And he then later represents- But the answer to that question doesn't necessarily have to do with tolling. It's unrelated to the merits of his Brady claim, is it not? It's, well, it's- If he had told him the correct answer, it still wouldn't have anything to do with the Brady claim. The answer would be you've exhausted your state remedies. Right. And now you are, in one sense of the word, eligible to have a warrant of execution signed for you. But that wouldn't have done anything with regard to the Brady claim that was just rejected. Well, you're only eligible if all of your appeals have been exhausted, federal and state. So the governor doesn't see your name unless you have gone through federal court and the U.S. Supreme Court has denied cert. So- So then Justice Quince was wrong? No, Justice Quince was right because they knew that he had not met his ADPA clock at that point. How would they know that if that issue hadn't been litigated? Well, they knew that he had not filed after his original 3850 federal habeas petition. I guess Justice Quince, it's not that she knew that, but certainly they were aware that- That it was a possibility. It was a possibility. But still, my question is, you grant tolling, statutory tolling, all the way through. Yes. All the way through, through July of 2010. I'm with you on all of that for that one claim. But then the habeas petition is not filed for another 590 something days, the habeas petition. Yes. So that's late. Yeah. And I'm asking you how you get equitable tolling to excuse the late filing on that claim on your alternative argument. Well, one issue I would say is the abandonment issue again, because Anderson does not have contact with Brown for nearly a whole year, despite Brown's letters to him asking what's going on, don't bypass federal court. I see you filed a cert petition, but I want to go to federal court. And- And has Anderson explained in any way, shape, or form why he didn't file within a year of the Florida Supreme Court's ultimate decision? No. I mean, Anderson made representations that he was timely, which he clearly was not. And so he misrepresented that fact to both Brown- There was no affidavit or deposition or- No, there was no evidentiary sort of proceedings in the district court. We submitted our appendix, which I think it taken as true, certainly would entitle us to have an evidentiary hearing based on the record. But we don't, so on this record, we don't know. So is your argument on this specific claim with the statutory tolling that you win as the record stands or that you warrant an evidentiary hearing to find out the reason why Mr. Anderson did not file on time? Well, I do think we win as we stand because we do have these periods of time where Anderson disappears and doesn't respond. And that's very similar to Holland where the client is writing what was characterized as abandonment. So there is a good chunk of time that would help with the tolling. You know, I want you to answer, but I was looking back at the last time this panel wrote an order in this case, and we talked about the fact that Anderson finally came forward to us and basically said he had a conflict of interest. I don't think he used the term divided loyalty, but he understood at that point that he was part of the equitable tolling problem and recognized that he needed to be replaced. And that's how you ended up here. I mean, so I had forgotten that. And I think that's important, but that conflict, at least the way I'm looking at it, I need to do a deep dive into the record and become as familiar as both of you are with it. But that conflict arises because he filed late and because he can't represent Mr. Brown on appeal when one of the arguments is going to deal with his untimely filing. And that makes perfect sense that he can't, he's got divided loyalties. But my question is, I guess you've answered is, we don't have anything from Mr. Anderson on the record as to the reason why he filed the habeas petition when he did. Is that accurate? That is accurate. Okay. I'm sorry, but I have, I just want to make sure I'm not missing any of them. Are there five letters from Brown to Anderson in this period for, well, sorry, I guess it's four letters and a phone call on Brown's behalf. And of those five communications, four are expressing concerns about filing federally and getting it done on time? Yes. Were there any other ones besides the ones that I've just mentioned on? No, the ones that are in those exhibits that we attach to our supplement are the ones that, and I believe you're correct as far as how many there were. But the other issue I just want to bring up before I ask if I can reserve the rest of my time is that there's also this issue of Brown's intellectual functioning that also does present some challenges. And I think some extraordinary circumstances in this case, because he functions at a very low level. Clearly he does start writing letters after he's been on the row and is surrounded by people who, and other inmates who have gone through the process, understand the process. But he himself, if you look at the various letters and the email from Bonner to her investigator, it's clear that he doesn't comprehend exactly what has to happen. And this is complicated to begin with, I think, for people who have degrees and study this and do this daily. But for a person who's in the bottom 4% of the population in terms of his intellectual functioning, this is a very big challenge to expect him to do more than he did. And so he does start writing those letters. I submit that that shows his diligence. He did, earlier in the process, he did try to reach out to the person running the registry to show some concern about his case. He's not sophisticated. He doesn't know any precise way to convey the information he may have about federal appeals and ADPA deadlines and that sort of thing. But I do think that that's another issue that has to be considered and could certainly serve as an extraordinary circumstance here. And as part of a reason to show that with what he's working with, he was extremely diligent in trying to make his case to get his 2254 filed. And with that, I would just ask if I may reserve the rest of my time for rebuttal. You may. Thank you. Good afternoon. Good afternoon. May it please the court. My name is Marilyn Beckue. I'm with the Florida Attorney General's Office, and I'm representing the respondent, the Department of Corrections, in this case. There's a couple things I just want to clarify because a few details were missing in the presentation here. Mr. Brown did have a lawyer as of May of 1999. The Supreme Court appointed Capital Conflict Regional Counsel for Mr. Brown, and that is actually noted in footnote two of the initial brief filed by Mr. Brown in this court. It's unclear why Conflict Counsel could not continue to represent Mr. Brown, but for some reason, they withdrew in August of 1999, and that's when Mr. Damore, I'm not sure how to pronounce his name, was appointed. He has had counsel throughout his proceedings the entire time. There was another gap, or I thought there was, maybe I'm wrong, after Ms. Bonner left and before Mr. Anderson came on, from January 9th of 2009 to April 20th of 2009. Ms. Bonner, let's see, she was allowed to withdraw by the Florida Supreme Court during the pendency of the appeal of the successive 3851, and then Mr. Anderson was appointed to pursue the appeal on behalf of Mr. Brown, but that was during the pendency of the appeal of the successive post-conviction motion in state court. Okay, so it didn't matter that he didn't have a lawyer is basically what you're saying. Correct. Also, the issue of Mr. McGuire slash Keenum was raised in the November 2000 post-conviction motion in state court by Mr. Bonacorsi. That's his initial post-conviction motion. He did subsequently amend it a few times, including the day of the evidentiary hearing, but he did not amend it to add a newly discovered evidence claim on the day of the evidentiary hearing, and had he, certainly that evidentiary hearing would not have went forward because that would have been a substantive claim that the state would have needed to respond to. What was it you said he raised before the evidentiary hearing? In his initial motion to the state court, Mr. Bonacorsi raises newly discovered evidence that Mr. McGuire was in fact, or maybe an alias, Mr. Keenum from Ohio, and he finds that out based on a DOC search, and the DOC records, the Florida Department of Corrections records, indicate that Ohio had put a detainer on Mr. McGuire slash Keenum in February of 2000. Mr. Bonacorsi raises that in his November 2000 motion as an issue of newly discovered evidence. May I ask, I looked for those three pleadings, the November, the February, and the April. Could you all, if you all are in agreement about what those filings were, could you all get together and produce them for the court? That would be fine with me, Your Honor. Okay, thank you. That would be helpful. Yes. Also, I just have another question that's factual in nature. When exactly was the additional discovery turned over by the state to Mr. Brown after the Florida Supreme Court denied rehearing? It was, let me pull that up here. I believe it was in December of 2006 after name camera inspection had been completed, but I do want to step back a little bit from that because the demand by Ms. Bonner was in 2004. Allegedly, the suspicious activity by the prosecutor that happened at the evidentiary hearing in 2001, which I'll get to, is what raised this red flag, allegedly. She doesn't even ask for any kind of discovery until 2004. I want to clarify, what she asked for was the state to create and produce records from the Ohio Department of Corrections as well as the FBI on Mr. McGuire slash Keenum. She's not asking for the information that's in the possession of the state attorney's office. That information was sent to the registry pursuant to state statutory rules. And in that disclosure through public records litigation back in 1998, 1999 is an NCIC-FCIC record regarding Mr. McGuire that has no indication that he's Mr. Keenum from Ohio. The information the state had during the trial, they had an FCIC-NCIC, they did. So your position is that if there was a Brady violation, it didn't occur until after the trial? I don't think there was a Brady violation at all. I understand, but that's why I'm saying your position is if there was one. Yes, but what happened here is that the state was compelled to produce evidence, not to give over evidence that it had in its possession, it was ordered to produce evidence. And there was quite a bit of litigation about that. And the state did take a cert to the Florida Supreme Court, which was ultimately denied as FBI investigative records, FBI criminal history records are privileged. They are not something that can be disclosed to anyone other than another criminal investigative agency. And so when the state writes the letter back in 2001 to Ohio saying, I want the records of Mr. McGuire slash Keenum. This is after Mr. Bonacorsi has raised an issue of newly discovered evidence in his initial post-conviction motion. So is it your position that that was the first time that the state became aware that Keenum and McGuire were one in the same was when Mr. Bonacorsi raised it in this motion? That was the first time the state became aware that there was a detainer based, placed on Mr. McGuire under the name of Keenum. Okay, let me ask you again. Is that the first time the state became aware that McGuire and Keenum were one in the same? I don't know that they became aware that they were one in the same, and I'm not trying to parse your terms too much, but that's the first time they became aware that it either was an alias or McGuire was an alias. So the answer would be yes, I guess, to your question. So that was the first time that anybody raised any issue of newly discovered evidence that either under an alias or using the alias of Keenum in Ohio that he had escaped from the burglary? Just to be clear, the state's position is it did not know, it had nothing in its records that would have showed it that McGuire and Keenum were using, I don't know how to put it in a way that you're going to be happy with, but in my view that we're one in the same person. I understand, yes. Until November when Bonacorsi made his filing? Correct. Okay, correct. And is there anything in the record that substantiates that? Yes, there is actually, because during the evidentiary hearing in April of 2000, this issue comes up and during a break in the proceedings, the prosecutor goes to his office and he comes back and he says, this is after I think Mr. McGuire has testified, that I'm letting the court know that I'm handing to Mr. Bonacorsi the certified convictions and the indictment from Ohio that I received. I went to my office, I didn't realize that I had them, but here they are. I obtained them as a result of Mr. Bonacorsi raising this newly discovered evidence claim, and I'm giving them to him. Now, the records that were subsequently disclosed in 2006 include medical records, mental health records, disciplinary records, pre and post-sentence investigation records from Ohio. Those are documents that would not have been given to the state of Florida or to the attorneys in this case, because they're privileged under Ohio law. This was a long progression of how we ultimately ended up getting these Ohio records, and it was because the state was ordered to get them from Ohio, and then we had to domesticate a Florida order in Ohio to then allow them to be sent for an in-camera inspection. This wasn't the state trying to conceal evidence that they had in their records. This was an issue of the state being compelled to create records on behalf of a post-conviction. I mean, I hear you. I mean, none of this was in the record before Judge Conway on our remand, was it? I don't believe so, Your Honor, but that's because they didn't establish any diligence or requirement for equitable tolling, and the second part of that is that the Florida found that that issue under state law was procedurally barred and untimely. So we have a state court decision based on state law that that issue, if it were going to be raised, should have been raised at a minimum within a year after the 2001 evidentiary hearing, if that's in fact what generated the suspicion that the state might have this evidence. But there was nothing presented to the state court, and there was nothing presented to the district court below, that there was any efforts on behalf of Mr. Brown from 2001, when this evidentiary hearing happened, till 2004, when Ms. Bonner is now asking for these records. The transcript of that evidentiary hearing for the first 3.850 was not in the district court record? Not to my knowledge, Your Honor. The state didn't file it? With its answer? I don't believe so, because the issue was limited to the timeliness of the motion, and because there wasn't any diligence in attempting to develop this alleged Brady claim from 2001 to 2007, when the successive post-conviction motion was filed. So what was before, in terms of the record, in terms of the state court record, what was not before the district court on remand? What did it not have that it should have had, or probably should have had? And I'm going to say this is what I believe was not before the court. I don't believe that the evidentiary hearing from the original 3.850 was before the district court in this case. The orders and pleadings were before the district court, but not the actual evidentiary hearing. And I also don't believe that the evidentiary hearing from 2008 was included before the district court. I could be wrong on that matter, but I believe it was based solely on the pleadings and the record. And I realize that that causes a little bit of a concern as far as, you know, the argument that's being presented here today. But when you peel away the layers of the onion, you get to the point of realizing that Mr. Brown hasn't shown any diligence with regard either to the initial claims. So here's my problem with that. If we look at what's in the record, the reason I have all these questions is because I can't tell from the record. And so if I'm looking at what's in the record, I see that, you know, there's this instance where Keenum and McGuire are one and the same. There's this letter from the prosecutor. It looks like maybe the prosecutor knows something that he or she hasn't turned over. And then there is a subsequent order from the state court that then requires further discovery. So it looks like when you're looking at that, that Mr. Brown may have established that there was a Brady violation and that he could not have known. I recognize that the Florida Supreme Court held differently on the first, on the successive claim. But it looks like he could not have known until such time, at least, as all of the materials were turned over pursuant to the court's order to do so. And so that that would have started a whole new clock. You're talking about his diligence, but to me, that doesn't even begin to kick in until we establish when the alleged Brady violation occurred, right? And not when it occurred, but when the materials were actually turned over. And so he should have been on notice of these materials. And so I can't even begin to figure that out based on this record. And it seems to me like that would be the state's burden to demonstrate. Well, I'd also point out that in the Florida Supreme Court's opinion, affirming the denial of the successive post-conviction motion, it notes that Mr. Brown, even as of 2010, could not establish that the state knew about this Keenum-slash-McGuire issue at the time of trial. And Mr. Anderson subsequently files, I think it was his motion for a certificate of appealability in this court in, I believe, May of 2014, and continues to represent. I don't know that the state knew about this back in 1996 or 1998 when the trial occurred. I am looking for government-funded discovery to find out if the state knew. And that's not a Brady claim. That's not a Brady violation. You don't get to dig through a prosecutor's files or go through depositions and get all this discovery. My point is simply this, though. I don't know that from this record you can tell that. I mean, you're telling me things that certainly make it seem that that's the case. And I have no reason to doubt you. But if it's not in the record, that seems like it's kind of a problem. Well, again, I would just refer to the court to the Florida Supreme Court's decision in 2010, where it says counsel conceded that he had no evidence to support the allegation that the prosecutor was aware at the time of the original trial that McGuire might have actually been Scott Jeffrey Keenum. And that's in Brown v. State, 41 Southern 3rd, 116 at page 118. So during the state proceedings, he was unable to prove that there was a Brady violation. He's still unable to prove that there was a Brady violation. But that's an alternative basis for a decision. That doesn't go to the timeliness issue or the equitable tolling issue. I know you've been asked questions about it. So I'm not faulting you for answering them. But I'm saying saying he has no Brady claim and can't establish a Brady claim is a different way of resolving this case than deciding that he's untimely and that the untimeliness is not saved by equitable tolling. Yes and no. There needs to be a valid underlying constitutional claim even to talk. Well, not valid that he's going to win, but enough to get you a COA. Arguably, yes. There needs to be an arguable claim. But there was no arguable claim in state court. And even through the proceedings here in this court, there still hasn't been any evidence to establish that the state knew anything at the time of trial about Mr. Keenum. Let me ask you a procedural question. And I'm going to ask Ms. McDermott the same question when she gets back up. If we think that those two or one evidentiary hearing transcripts are important for us to figure out these issues, do you want us to look at the evidentiary hearing transcripts if you supplement the record on our own? Or send this back down to the district court for a remand if we were to get to that point? Ordinarily, I would say that you shouldn't look at something that wasn't before the district court. So then strike my direction about the three filings. In this particular case, these are transcripts of an evidentiary hearing that deal with the very issues that are being raised in this court. And let's not forget, and I understand that it would have been beneficial to provide these to the district court on behalf of the state. But it is Mr. Brown's burden to show that he's entitled to any equitable tolling. So the information that he provided to the district court did not establish that he was entitled to any equitable tolling. I know, that's why I prefaced my question with if we decide that we need to look at these documents. So you would say, I think, you can tell me if I've mischaracterized what I think you're going to say, that if we think it's necessary to look at the records of these two or one evidentiary hearings, that you should be allowed, with Ms. McDermott, to supplement the record with copies of those and that we should look at them ourselves? Yes, your honor. Okay. And I know we've talked a lot about the alleged Brady claim, but I just kind of wanted to point out as well that this isn't a case of, if you go back to the original denial of cert by the United States Supreme Court in this case in May of 1999, this is not an issue where a petitioner is a few weeks, a few months, or even a couple years out of time. We're talking about over a decade of time that passed between the affirmance of his conviction and sentence and the denial of cert by the United States Supreme Court and the filing of any motion. And even that motion, even if you wanted to accept that this alleged Brady issue started the time ticking again, even that motion was not timely filed. And I realized that Ms. McDermott has represented that Mr. Brown wrote some letters to Mr. Anderson regarding his federal claims. But we know by 1994, Mr. Brown knew of federal issues and it's in the initial brief in this court filed by Mr. Brown. You don't mean 94, right? I'm sorry, 2004. Okay. Yeah, he didn't know beforehand, no. 2004, there is an email to Ms. Bonner from her investigator in 2004 that says essentially, and it's in the record, I'll let you look at it. It's in there pleading. Mr. Brown has been told by someone of his federal issues and that's all he can talk about now is his federal issues. This is in 2004. He's already three years at least past the time for filing his, maybe even four years, his federal habeas petition. So we know he knows, as of 2004, something about federal issues. And that email even says, I've explained to him that his time has expired and he seemed to grasp that at some point, but now he just wants to talk about his federal issues. So what did Mr. Brown do from 2004 to diligently pursue his rights even at that point? And then we get to where Ms. Bonner starts an additional round of state court proceedings, including this demand for all this discovery, which ultimately she received, although arguably had the state file this petition in a timely manner, she might not have. But that really is not particularly relevant to the fact that his petition was still ultimately filed in an untimely manner. Well, it's only relevant if, if for some reason there's reason to believe that a Brady violation occurred and that they did not have reason to know or should not have otherwise known what was in the content of those records and that all of those records were somehow a part of that Brady violation until such time as it was turned over by the state. Right, and again, the red flag that has been continually alleged through the state court and through federal courts that allegedly created the suspicion that the state knew something occurred in 2001 during the evidentiary hearing. So we're now in 2004, and there was no efforts on behalf of Mr. Brown by Mr. Bonacorsi or Ms. Bonner to find those records. And I'll take that back. And I know this isn't before the court, but I don't want to misrepresent it either. During the litigation in 2004, when Ms. Bonner files this demand for discovery, she does say she attempted to get with the Ohio Department of Corrections and they wouldn't give her the information. And because the information was privileged and not something that they would provide to her, which is why she ultimately filed the demand to get a court order to have the state create these documents, to have the state go get the documents from Ohio. So, you know, potentially she made some efforts, but she wasn't appointed until 2003. So whatever efforts she made were still well outside of a time for, you know, establishing any diligence if your claim arose in 2001. Let me ask you a question, which is based in part on a position that you vehemently oppose, okay? So the first part, you're going to just have to assume something you don't agree with. Assume that the Brady claim that you don't think is valid to begin with was properly raised in the second 3.850 motion and that statutorily, all of the time until July of 2010 is told on that claim and that claim only. So that his clock, if all of that is correct, and I know you disagree with it, starts to run at that time. What are we to do with the record as it stands with regards to Mr. Anderson not responding to Mr. Brown's letters and then filing an untimely habeas petition even as to that one claim? Well, Mr. Anderson did respond to an initial letter from Mr. Brown after that claim with regard to what Justice Quince and Justice Perriente meant in their opinion. He does explain that. Then there were some other efforts by Mr. Brown apparently through letters and phone calls. And at this point, Mr. Anderson goes ahead and he files the petition. So he does file it late, but he does go ahead and file the petition. Now, if he did it untimely as a matter of negligence, that's not sufficient for an extraordinary circumstance that would allow for equitable tolling. So you need to have both. You need to have some diligence on behalf of Mr. Brown, and you also have to have an extraordinary circumstance that's something beyond negligence on behalf of Mr. Anderson. And I realize that counsel is claiming that Mr. Anderson abandoned his client, but he ultimately filed the pleading and he continues representing Mr. What if he filed it five years later and every month Mr. Brown wrote him a letter saying, when are you filing my petition? I'm really worried it's not going to be on time. Well, I think there are two issues there. One would be a closer issue with reference to whether Mr. Anderson's behavior met extraordinary circumstances, but there's also an issue of diligence. What did Mr. Brown do when he realized his attorney was not filing? He writes them every month. He wants to file. Right. But even in Holland, Mr. Holland went ahead and filed his own petition because he understood that he needed to go ahead and do something. This guy has a 73 verbal score. Well, and that's an issue that goes to his intellectual functioning that I would like to briefly address if it's OK with you. Before we leave this topic about abandonment, negligence, all of that, I've noticed it's something that's been worrying me for a while. So Judge Conway, at the time she issued her order, cites the standard in the first cadet opinion, which was in order for there to be tolling, there has to be abandonment, bad faith, divided loyalty. And then that opinion has since been vacated and the standard's a little looser for equitable tolling. Do we need to remand so that she can apply the law as it stands now? I don't believe so because when cadet was vacated and a new opinion was issued, it was an opinion, and I think it even says right there in the opinion, this is an effort to clarify what we said. We didn't say that the only thing that would absolutely, 100%, nothing else would ever rise to the level of extraordinary circumstances is abandonment. But it is certainly one of them that could rise to the requirement for extraordinary circumstances. And it's kind of one of those situations of it's hard to tell sometimes what it is, but you know what it is. The language she quotes from cadet one says, abandonment of the attorney-client relationship such as may have occurred in Holland is required. That's the language she quotes. Right, and under the facts of this case and what they're alleging, they need to allege something more than negligence like abandonment. They're not alleging mental incompetence on part of Mr. Anderson. I'm sorry, I didn't mean to interrupt you. That was my fault. Please, please finish. Well, they weren't alleging anything other than some type of abandonment from Mr. Anderson. So what the law is, is that you have to have something more than simple negligence. And the only thing they could establish, if anything, were negligence on behalf of these attorneys, not abandonment. And that's the basis of their claim. They're not claiming, for instance, Mr. Anderson is mentally incompetent or has some other circumstance outside of Mr. Brown's control that led him to file this petition late. Well, there's a vast body of conduct that goes in the continuum from negligence, which doesn't get you equitable tolling, everybody agrees, and flat out abandonment, which can, right? Yes. And the question is, how far along that continuum do you have to get toward abandonment and away from negligence to satisfy the equitable tolling precepts? Your argument is that you have to get to abandonment or that something close to but short of abandonment might suffice in a given case? I can't, in my own head, come up with every circumstance that might satisfy extraordinary circumstances. But when you're alleging that, essentially, your attorney abandoned you, you need to prove that your attorney abandoned you. And that's not what happened in this case. So to the extent there was any negligence on part of Mr. Anderson, and I apologize if that's not an overly satisfactory answer. And I realize that this area of the law gets to be a little granular after a while, depending on the cases that you're dealing with. But if we stick to the case that we are dealing with, the allegation was essentially that Mr. Anderson abandoned Mr. Brown. And he didn't prove abandonment. If he proved anything at all, as the district court's order says, is some kind of negligence on behalf of Mr. Anderson for not timely filing the petition. And again, I just reiterate, he does ultimately file it. And he does ultimately ask this court to be removed as a matter of his own conflict because he wouldn't be able to adequately argue equitable tolling. So he hardly abandoned Mr. Brown in this instance. I think we had to prompt that letter. We had to ask him, hey, don't you have a conflict? Unless the court has any other questions. Thank you for your time. Thank you. Before I forget, because we'll start asking you questions and the time will run out very quickly, let me ask you the question that I asked Ms. McHugh. If we think that we need to review the transcripts from one or both of those evidentiary hearings, first, do you agree or not agree that both sides can and should supplement the record here with those transcripts? Or do you think that's a matter for remand? I think that's a matter for remand. And then that answers the second question, which is you don't think we should be looking at those transcripts ourselves, even if you supplemented the record? Correct. I just want to explain, though. I mean, I realize those are part of a record. They are not, you know, they certainly in the normal course of circumstances are available to you. My concern here is that we shouldn't be diving into a state court record on our own and finding it somewhere in the cyber world and then looking at it ourselves without the parties telling us this is the record. We've looked at it. This is the certified copy. Here it is. That's a different thing. I mean, I just think that it could open up a whole scenario where we're trying to give you more than just those pieces to say, but we can explain or we can refute that representation that was made to the state circuit court with this. So you need to look at it. And so that's my concern. And I don't necessarily know that there's anything like that. But I fear that we then turn this court into what it's not supposed to be, which is the fact finder. And so I realize that I'm asking then for more process and the court's indulgence. But I think that that's the appropriate thing to do would be to remand if that's a concern and allow us then to hopefully have an evidentiary hearing, but at a minimum supplement the record with anything that we think supports or refutes the various pieces of evidence that could be submitted at that time or pieces of the record. Do you think we, OK, let me ask you the other question then, which is the question that Judge Martin asked Ms. McHugh. Do you think that a remand is warranted to apply what I call the new CADE equitable tolling standard or the standard that we develop, whatever it might be, after the first CADE decision was issued? Or do you think that's something we should do here on appeal ourselves, regardless of what the record looks like? I mean, I think it goes to you're doing a de novo review. And so if the law has changed, I think it would be appropriate for the court, this court, to be able to then find if the district court had misapplied something or a case changed their analysis. So under that circumstance, I think because of the standard of review here, it would be OK for the court to review based on the new CADE. And I'm outnumbered. But I certainly never object to a remand. So but yes, and that was part of our argument, was that the district court didn't use the correct standard. And that is why the court should reconsider the various findings that were made. But I just want to mention something about Bonner. Because if you're not inclined to toll the time from the disclosure of the supplemental Kenum records that came in 2007, I believe, then Bonner becomes relevant to this tolling issue. And Bonner in the Thomas case, which is in the district court right now, the state has stipulated with the defense that Bonner intentionally missed the deadline, the ADPA deadline. So if the ripened Brady claim was in her possession, then certainly I think that, and if she's going to become relevant, we would need to have some sort of proceedings to find out why. Because we know that in Thomas, she didn't file because she wanted to challenge the statute. And that, as the 11th Circuit said in the remand opinion on Thomas, that would be egregious and would likely rise to the level of extraordinary circumstances that would require equitable tolling. But isn't she also faced, taking all you've said as a given, isn't she also in a little bit of a different posture because at the time she gets appointed, an attorney in her position, the minute she gets to file, could make a rational judgment that he's already ADPA barred? When she gets appointed in July of 2003 or thereabouts, his conviction becomes final in May of 99. And the 3.850 was filed in 2000, already outside of the one year window. And then by the time she gets appointed, another four more months have passed by. Couldn't she just think, he's already blown the ADPA deadline, I might as well put all my eggs in the state basket and see what relief I can try to get him on the state side because going to federal court is just not going to be feasible? Well, two things. First, I would say absolutely not. If you inherit a case where you're concerned that the ADPA deadline has been missed, the attorney, I think ethically, must do something to go to federal court and to make the case. Whatever case it might be, it might be weak, it might be strong, but you need to make the case and you need to ask for the stay if you've got something going on in the state courts. You would never. Even if that just plays out horribly wrong, like the state, the federal court dismisses a mixed petition and says, I'm not staying, I'm dismissing. But under the law, they couldn't. I mean, they. What do you mean they couldn't? Well, you can't just dismiss the mixed petition. Under Rines, you would hold it in abeyance. Not always. Well, I think. You're not required to hold a mixed petition, right? You're not required, but it would be, I think, that the burden of the state to show that those state proceedings were meritless or something else would have to be so high that you wouldn't do that as an ethical attorney that understands the importance and the various prongs of equitable tolling. You would be. My only point is she's gotten this case at a stage where the patient's already in serious trouble, right? The case is already procedurally damaged. It's not pristine. And lawyers have difficult decisions to make when something like that happens. True, but if she misses the EDPA deadline on purpose has happened in the other case, that's a whole different ball game, but she didn't get a case that was clean. I see this distinction you're making, but I don't think that. I think it's still egregious professional misconduct not to do something to assert your client's rights in the federal court and move for the abeyance, move for equitable tolling, and put that out there. Because all you're doing if you don't is setting up a case like this, where it just becomes one time period after another, which clearly the burden becomes more and more overwhelming. So I do think it's relevant what Bonner did or didn't do in terms of both the unripened Brady claim that comes later in time and also as to the first post-conviction motion. I appreciate your time. I would just ask the court to grant or reverse the federal district court and grant the tolling in this case for Mr. Brown. Thank you. Thank you very much. These are difficult cases, and the presentation is very helpful. Thanks, Chief. Thank you.